# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DARRELL HIBBARD,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-599

Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 8), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply

memorandum (Doc. 12).

## I. Procedural Background

Plaintiff filed an application for SSI on March 1, 2008, alleging disability since February

5, 1990, due to spina bifida. Plaintiff's application was denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a de novo hearing before Administrative

Law Judge (ALJ) Larry A. Temin. Plaintiff and a vocational expert (VE) appeared and testified

at the ALJ hearing. On June 9, 2010, the ALJ issued a decision denying plaintiff's SSI

application. Plaintiff's request for review by the Appeals Council was denied, making the

decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

Plaintiff was born with spina bifida.  He has been followed for his condition at the Children's Hospital Multidisciplinary Spina Bifida Clinic.  Plaintiff was seen at the clinic on January 8, 2007, for right side lower back pain that had its onset one week prior.  (Tr. 212).  The pain was intermittent and occurred with activity and decreased with rest.  Plaintiff was referred to physical therapy.

On May 21, 2007, Dr. Elizabeth Jackson, M.D., of Cincinnati Children's Surgical Services, Pediatric Urology Department, issued a report on plaintiff's neurogenic bladder[1] and bowel issues.  (Tr. 211).  Dr. Jackson reported that plaintiff "is completely continent day and night."  (*Id.*).  Although plaintiff reported that he "sometimes has to stand at the toilet a minute before the urine will come," he denied having to strain; he was bowel continent; and he had not had any urinary tract infections.  (*Id.*).  He was not on any bowel or bladder medications.  Dr. Jackson noted that although plaintiff did not "empty completely," he did not seem to be symptomatic.  (*Id.*).  The plan was for a renal ultrasound to be performed in one year with plaintiff to advise Dr. Jackson if he became incontinent or started to have urinary tract infections before that time.

Plaintiff was seen at the Spina Bifida Clinic for an annual physical examination on December 12, 2007.  (Tr. 204-206).  He complained of lower back pain of one month's duration.  (Tr. 204).  Plaintiff was not on any medications and was not doing any exercises for pain management.  It was noted that he had smoked a half pack of cigarettes a day for seven to eight

---

[1]"Neurogenic bladder" is a dysfunction that results from interference with the normal nerve pathways associated with urination.  http://medical-dictionary.thefreedictionary.com/neurogenic+bladder.

years. Plaintiff was assessed to be a "well adolescent with spina bifida." (Tr. 206). He was

diagnosed with spina bifida; back pain for which he was prescribed 800 mg ibuprofen and

referred to orthopedics through the Spina Bifida Clinic; and neurogenic bladder. (Tr. 206).

Outpatient clinic progress notes dated May 21, 2007, state that plaintiff complained of

lower back pain that occurred daily and increased with activity. (Tr. 207). No other complaints

were noted. The notes indicate that plaintiff was not undergoing physical therapy.

Plaintiff was seen for follow-up at the Spina Bifida Clinic on February 4, 2008, by Dr.

Thomas Webb, M.D. (Tr. 196-197). Dr. Webb reported that plaintiff's chief concerns remained

a lumbosacral level lipomeningocele[2], back pain, leg-length discrepancy, and neurogenic bowel

and bladder. Plaintiff was on no medications and no medications were prescribed. There had

been no intervening hospitalizations, surgeries, or illnesses. Dr. Webb reported the following

concerning plaintiff's physical problems:

- Lumbosacral issues: There were no changes in plaintiff's motor or sensory abilities; no new problems with bowel or bladder function; and no trouble with ambulation, tripping or falling.
- Chronic leg length discrepancy. Although plaintiff had a history of wearing a shoe lift on the left, he had been wearing regular shoes due to a problem with a shoe lift separating soon after purchase, which had resulted in a significantly altered gain and significant twisting of his back while ambulating. Plaintiff had been complaining of recurrent back pain. The plan was to meet with the hospital's Brace Shop and have plaintiff fitted for another set of heel and sole lifts.
- Back pain: Plaintiff had been having paraspinal back pain with ambulation and prolonged sitting, which was relieved by lying back. Plaintiff was not having associated problems with spasms, spasticity, tripping, falling, or bowel or bladder dysfunction. On exam, he had mild paraspinal muscle tenderness, but no spinal tenderness and no leg lift pain. The recommendation was to correct the leg length discrepancy to see if that relieved the pain.
- Neurogenic bladder: No problems were noted with the neurogenic bladder as plaintiff

---

[2]A lipomeningocele is a hernial protrusion of the meninges through a defect in the vertebral column associated with an overlying lipoma. http://medical-dictionary.thefreedictionary.com/lipomeningocele; http://medical-dictionary.thefreedictionary.com/meningocele.

had the ability to spontaneously void, he was having no problems with incontinence, and he reported no history of urinary tract infections or stones.

The plan was to see plaintiff in six months, and the clinic remained available to plaintiff in the interim. (Tr. 196-97).

On May 9, 2008, plaintiff was seen for left ankle swelling of unclear etiology. (Tr. 198). There was no evidence of infection. Dr. Junichi Tamai, M.D., subsequently saw plaintiff at the Myelomeningocele Clinic at Children's Hospital on June 2, 2008, for evaluation of a left ankle mass. (Tr. 249-251). Plaintiff had received a new solid ankle AFO (ankle-foot orthotic) in February 2008 and had noticed a bump near the end of March 2008. Plaintiff reported no increase in his activities and no injuries. He reported no discomfort and stated that he "wears his AFO when he walks around the city." (Tr. 249). Dr. Tamai noted: "He apparently walks quite a bit. He walked from Colerain to State Road. He can keep walking for hours." (Id.). Dr. Tamai reported that plaintiff had been treated for an infection behind his right ankle in the past and that he had also been treated for his left clubfoot by Dr. Alvin Crawford, who apparently performed a radical release and a talectomy many years earlier. Dr. Tamai reported that plaintiff had not required any revisions. Plaintiff reported that he used to smoke 1½ packs of cigarettes a day but was down to ½ pack a day. Dr. Tamai reported that plaintiff had some sensation in his right foot "that seems to keep him out of trouble." (Tr. 250).

On physical examination, plaintiff was able to ambulate independently without his brace. (Id.). The brace fit reasonably well. His foot came to the plantigrade position easily and could dorsiflex "just a touch more." (Tr. 250). When he stood, his right calf was "underdeveloped as

4

expected" and was "very, very small compared to the right one which [was] quite strong."[3] (*Id.*).
He had a "little bit" of a valgus tilt to his foot and ankle complex on the left side. (*Id.*). He was
able to ambulate but did not have much strength on the left as expected. He had some callosities
at the base of his heel and his metatarsal heads on the right and a prominence just proximal to
this calcaneus at the base of his Achilles insertion. He did not have much sensation around his
left foot and ankle. (Tr. 251). X-rays showed that his ankle and foot were in a plantigrade
position.[4] Dr. Tamai diagnosed plaintiff with a bursa on the left ankle which he indicated should
get better if plaintiff's activity level changed, but which in itself was not harmful. Dr. Tamai
encouraged plaintiff to stop smoking and planned to follow up with him in two years as long as
he continued to do well, with plaintiff to follow up with other physicians in the interim. (Tr.
251).

Katherine Thoman, RN, CNP, Division of Developmental and Behavioral Pediatrics, was
the attending certified nurse practitioner for plaintiff's visit to the Spina Bifida Clinic on June 2,
2008. (Tr. 244-246). In the summary report of plaintiff's visit, Nurse Thoman stated that
plaintiff's main concerns remained  lumbar level spina bifida, neurogenic bowel, neurogenic
bladder, and lower extremity orthopedic concerns. (Tr. 244). She reported that plaintiff had not
had any major illnesses or surgeries since his last visit but had developed a rather large area of
swelling and redness on his left lateral ankle. Otherwise, the review of systems was negative.
She noted that:

---

[3]Dr. Tamai apparently meant to write that the left calf was underdeveloped and small as compared to the right one.

[4]"Plantigrade" means walking on the sole of the foot with the heel touching the ground. http://medical-dictionary.thefreedictionary.com/plantigrade.

> Orthopedically, Darrell denies pain in his neck, back, hips, legs and feet. He is a community ambulator[5] who walks long distances frequently. He does not use any assistive devices for ambulation. He does have AFOs at his time.

(*Id.*). She noted that plaintiff received his AFOs through the Brace Shop. Nurse Thoman reported that plaintiff was not taking any medications. His only new "diagnosis" was he had recently moved out of his previous school district. His AFOs were in good condition and his gym shoes that he typically wore were particularly worn on the bottom. (Tr. 245). No kyphosis or scoliosis was noted. On physical examination, reflexes were 2+ at the knees and absent at the ankles. The recommendations made were: (1) plaintiff would meet with Brace Shop personnel to have his AFOs tightened as it was felt that rubbing of the braces was causing the swelling on his left ankle; (2) plaintiff was counseled on the importance of tying up the laces on the gym shoes as "[w]ith all the walking Darrell does, [Ted Ryder from the Brace Shop felt] that if he tightened his shoes, he would also tighten the brace therefore preventing any additional rubbing;" (3) Dr. Tamai from orthopedics met with plaintiff, reviewed the x-rays from earlier in the day, agreed with the plan to tighten up the brace, and was to follow up with plaintiff in one year; (4) plaintiff was counseled on the importance of finishing high school and participating in a program that would allow him to ride the bus at a reduced rate; and (5) plaintiff was advised to follow up with his primary care physician for his annual physical and as necessary; and (6) plaintiff was to return to the Spina Bifida Clinic in six months. (*Id.*).

Dr. Phillip Swedberg obtained x-rays and examined plaintiff on June 13, 2008. (Tr. 229-

---

[5]"Community ambulators" are individuals who walk indoors and outdoors for most of their activities, possibly with the use of orthotics and/or aides such as crutches. They may use a wheelchair for long distances. Spina Bifida: Management and Outcome, p. 353, M. Memet Ozek, Giuseppe Cinallie, Virginia June Maixner (Springer 2008).

234).  The x-rays showed some bowing of the tibia but no evidence of a fracture or dislocation; some bowing posteriorly of the tibia; and a normal hip.  (Tr. 233-34).  Plaintiff complained that his back pain had become progressively worse over the last year.  (Tr. 229).  Plaintiff was reportedly being followed by Dr. Butman, who thought plaintiff's back pain was caused by "muscle strain due to [plaintiff's] limp."  (Id.).  Dr. Swedberg noted that plaintiff had been treated at Children's Hospital but had not had recent imaging studies or physical therapy and had not been prescribed medication to treat his back pain.  (Tr. 229).  Plaintiff described the pain as mild to moderate and stated that prolonged ambulation or standing exacerbated the pain, as did lifting heavy objects.  He denied radiation of the pain to the lower extremities.  Plaintiff took no medication for the pain, including over-the-counter remedies.  Plaintiff also complained of his knees giving out on him two to three times per day, but he had never fallen and he denied pain in his knees.  Plaintiff reported smoking a half pack of cigarettes daily.

Dr. Swedberg described plaintiff as ambulating with a lurching gait.  (Tr. 229-30).  He was comfortable in both the sitting and supine positions.  (Tr. 230).  He was wearing a left AFO. He circumducted with his left lower extremity as he ambulated, and his left foot was turned laterally.  He did not use a cane.  Range of motion of the cervical spine was within normal limits. Spine curvature was normal.  He had no difficulty bending at the waist to 90 degrees.  He was unable to ambulate heel to toe.  There was no evidence of paravertebral muscle spasm, and percussion of the lumbar spinous processes was not associated with tenderness.  On examination of the spine, straight leg raising was normal to 90 degrees bilaterally.  Lateral motion of the spine was normal to 30 degrees bilaterally.  On neurological examination, pinprick and light touch were markedly decreased from the left mid-thigh to the knee with numbness from the left knee

7

down. The patellar and Achilles tendon reflexes were decreased bilaterally. The calves measured 35½ cm. on the right and 21½ cm. on the left. The right lower extremity measured 96 cm and the left lower extremity measured 89 cm. Muscle strength was decreased with respect to the left ankle muscle groups at 3/5 and 5/5 elsewhere throughout. Findings pertaining to the knee were normal. (Tr. 231). He had no active movement of the left ankle. Range of motion of the right ankle was normal. Upper extremity findings were completely normal. Dr. Swedberg's impression was (1) chronic low back pain with a) gait disturbance, b) history of spina bifida, and c) leg length discrepancy, and (2) history of bilateral knee instability. (Tr. 231).

Dr. Swedberg stated in summary that plaintiff reported he was unable to work secondary to chronic low back pain. He opined that plaintiff appeared capable of performing "only a mild amount" of ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. (*Id.*). He found that plaintiff had no difficulty sitting, reaching, grasping and handling objects. (Tr. 231).

State agency reviewing physician Dr. W. Jerry McCloud, M.D., reviewed the file on July 2, 2008, and completed a physical residual functional capacity (RFC) assessment. (Tr. 235-242). He found that plaintiff can occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (Tr. 236). He could never climb ladders/ropes/scaffolds and could occasionally climb ramps/stairs and balance, stoop, kneel, crouch and crawl. (*Id.*). Dr. McCloud opined that plaintiff would be limited to occasional foot pedals with the left leg and standing/walking a total of 4 hours in an 8 hour workday. (Tr. 237). As support for his findings, Dr. McCloud noted that plaintiff ambulated with a lurching gait; he circumducted his left lower extremity as he

8

ambulated and his left foot was turned laterally; he does not use a cane; sensation and strength were preserved in the upper extremities; spine curvature was normal; he was unable to heel to toe ambulate; he had no muscle spasm of the spine; straight leg raising was normal to 90 degrees bilaterally; he has a leg length discrepancy; sensation was markedly decreased from the left mid-thigh to the knee; patellar and Achilles tendon reflexes were decreased bilaterally; muscle strength was decreased in the left ankle muscle groups but was 5/5 elsewhere; he had limited range of motion of the left ankle but normal range of motion elsewhere; the x-ray of the right hip was normal; an x-ray of the left leg showed some bowing of the tibia; the February 2008 exam report stated that plaintiff was not on any medications, he was not having any problems with ambulation, tripping or falling, and there were no changes in his motor or sensory abilities; and the May 9, 2008 examination results showed that he had left ankle fluid with limited sensation but no redness, warmth or drainage. (*Id.*). Dr. McCloud considered plaintiff's statements to be credible. (Tr. 240). Dr. McCloud indicated that the treating or examining source physical capacity statements on file did not differ significantly from his findings. (Tr. 241). Dr. Teresita Cruz, M.D., affirmed Dr. McCloud's opinion as written on October 28, 2008. (Tr. 243).

A sonography of the kidneys and bladder was performed on August 4, 2008. (Tr. 252-53). The results showed findings consistent with a neurogenic bladder; a nonspecific finding of debris within the urinary bladder; and normal kidneys. (Tr. 252). There was "a small post void residual." (*Id.*).

Nurse Thoman completed a Physical Residual Functional Capacity Questionnaire on July 17, 2009. (Tr. 304-308). She reported that she saw plaintiff "freq[uently] - at least annual[ly] for [follow up appointments]." (Tr. 304). She listed his diagnoses as lumbar level spina bifida,

neurogenic bowel and bladder, lower extremity orthopedic concerns, and leg length discrepancy. She described his prognosis as "lifelong disability." (*Id.*). Nurse Thoman listed plaintiff's symptoms as "back pain, difficulty ambulating" and stated the back pain was associated with ambulation and prolonged sitting. (*Id.*). She described the treatment as AFOs and a shoe lift. (Tr. 305). She estimated that plaintiff can walk zero city blocks without rest or severe pain. (Tr. 306). Nurse Thoman opined that plaintiff can stand/walk less than 2 hours in an 8 hour work day; he can sit about 4 hours in an 8 hour work day; he must walk around during the work day; he needs a job that allows him to shift positions at will from sitting, standing or walking; he will sometimes need to take unscheduled breaks during an 8 hour work day; he can frequently lift less than 10 pounds, occasionally lift 10 pounds, and never lift 20 pounds; he can never climb ladders; and his impairments are likely to produce bad days. (Tr. 306-308).

On October 12, 2009, Dr. Karin S. Bierbrauer, M.D., of the Children's Hospital Neurosurgery Department saw plaintiff for a follow-up appointment. (Tr. 257-67). She diagnosed plaintiff with tethered spinal cord, lipoma[6] of unspecified site, and neurogenic bladder. (Tr. 257). Dr. Bierbrauer noted that when seen, plaintiff had a lumbosacral lipomyelomeningocele, which had been untethered both when he was one-day and six years old. She reported that plaintiff had always had an asymmetric exam with weakness in the left lower extremity, greater than on the right. She further reported that plaintiff had required catherization for a neurogenic bladder until approximately four years earlier. Dr. Bierbauer noted that according to plaintiff, he had suffered from progressively debilitating back pain over the past

---

[6]A lipoma is a benign, soft, rubbery, encapsulated tumor of adipos, usually composed of mature fat cells. http://medical-dictionary.thefreedictionary.com/lipoma.

several years, which he attributed largely to his inability to obtain insurance and finance the

proper bracing and shoe inserts that he required for his length discrepancy. (Tr. 258). Plaintiff's

shoe insert in the left shoe at that time was two years old. Plaintiff stated his back pain was

predominately in the paraspinal region and was as strong as 8 out of 10 on the Visual Analog

Scale for pain. He reported the pain increased with activity, especially walking and sitting

upright, and was relieved somewhat by lying down but not by any type of medication such as

Tylenol or ibuprofen. He described the pain as a deep, dull ache. He complained of intermittent

5-20 minute periods recurring several times a day when his lower left extremity would become

stiff, and he stated that this significantly interferes with his ability to walk if it occurs while he is

walking. Concerning plaintiff's urinary function, Dr. Bierbauer reported that plaintiff voided

spontaneously with a normal stream; plaintiff stated that he retained about 3 ounces; and he had

not had any urinary tract infections since last seen.

Plaintiff's current level of mobility was reported to be "ambulatory with braces only."

(*Id.*). His gait was described as an "abnormal gait manifested by weakness of the left lower

extremity." (Tr. 259). His "right sensory [was] inconsistent through right L5, left sensory [was]

inconsistent through L4." Toes were equivocal bilaterally and patellar reflexes were absent

bilaterally. Dr. Bierbauer gave the following assessment:

> Darrell is a 19 [year old] male who has undergone 2 previous untetherings of a
> lumbosacral lipomyelomeningocele. Although he is currently able to ambulate
> and does not catheterize, he continues to have back pain which we first noted in
> 2007. When asked to point to the site of his pain, he points to the right paraspinal
> region as he did in 2007. The fact that his pain seems to be better when he was
> able to have proper bracing for his left lower extremity atrophy and shortening
> suggests that he might benefit from physical therapy and proper bracing as
> insurance and finances permit. Certainly to consider reexploration solely on the
> basis of pain in someone who is otherwise relatively stable would be rather

11

aggressive without trying other more conservative measures, especially in this age group. I am not sure what to make of the intermittent left lower extremity stiffness that he reports, but we will proceed with an MRI to be sure that he has not developed a spinal cord syrinx which could cause spasticity.

(*Id.*).

The plan was to obtain an MRI of the thoracic and lumbosacral spine with tethered cord protocol; follow-up with neurosurgery per the spina bifida clinic protocol; and consult physical therapy for pain management and manual muscle testing. (Tr. 266).

Plaintiff was seen by Dr. Mary McMahon, M.D., in the Myelomeningocele Clinic at Cincinnati Children's on that same visit. (Tr. 254). Dr. McMahon reported that plaintiff had sacral level lipomeningocele and had last been seen by Pediatric Physical Medicine and Rehabilitation in November 2005. She reported that plaintiff described some intermittent back pain that was localized to his right low back, but he denied any radiating pain or any changes to his strength or ability to ambulate. Dr. McMahon reported that from a functional standpoint, plaintiff continued to do "relatively well." (*Id.*). She noted he "is walking household and long community distances. He is ascending and descending stairs independently as well." (*Id.*). Dr. McMahon noted that plaintiff was utilizing a solid ankle AFO brace on the left, and he reported that his braces were at least a couple of years old. Dr. McMahon noted that she had written two prescriptions for heel lifts in the last four years, it was not clear if plaintiff had ever utilized the heel lifts, and he was not currently using a heel lift. On physical exam, plaintiff was within functional limits of passive range of motion in his right lower extremity; he had distal atrophy in his left lower extremity and significant leg length discrepancy in his left lower extremity; he had external rotation of his left tibia; he had plantigrade foot on the left with about 20 degrees of

motion and increased pronation; he had no active movement at his ankle; he had good strength with hip flexion and knee extension on the left; his hip adductors and extensors were estimated to be 4-/5 on the left; and he was noted to have significant pelvic assymetry related to his leg length discrepancy when observed ambulating. (*Id.*).

Dr. McMahon diagnosed plaintiff with sacral level lipomeningocele associated with significant weakness and atrophy of his distal left lower extremity. Her assessment was as follows: (1) Plaintiff was to take some precautions with regard to his brace due to redness over his left medial malleolus, he should be evaluated at the Brace Shop if the redness did not resolve, and he would likely benefit from a shoe lift on the left; and (2) if the Neurosurgery Department found nothing of concern on his imaging, his back pain was likely mechanical in nature; a prescription for physical therapy to instruct plaintiff on a home program for his back was discussed; and although plaintiff did not appear to be interested in that option, he was to contact Dr. McMahon's office if he changed his mind. (*Id.*).

Nurse Thoman also consulted with and examined plaintiff on October 12, 2009. (Tr. 274-303). She noted he had last been seen in the Spina Bifida Clinic on October 5, 2009, and she reported he was doing well with no new or ongoing concerns. (Tr. 275). No bowel/bladder problems, neck pain, back pain, leg pain, or changes in gait were reported. (*Id.*). Plaintiff had no pertinent bladder symptoms and no bowel concerns. (*Id.*). He was "community ambulatory." (*Id.*). Nurse Thoman reported that he needed a shoe insert for his lumbosacral lipomyelomeningocele but a lack of resources was preventing him from obtaining the proper equipment. (*Id.*). Plaintiff was not taking any prescription medications. (Tr. 276). He had musculoskeletal stiffness of the left leg. (Tr. 276). His active diagnoses were tethered spinal

13

cord, lipoma of unspecified site, and neurogenic bladder. (Tr. 277). His muscle bulk was decreased in the lower extremities. (Tr. 278). He had no ankle reflexes. The only notations made as to plaintiff's back on physical examination were "normal posture, intact surgical scar." (Tr. 277). It was noted that Dr. Bierbrauer had recommended that plaintiff start physical therapy for pain and for complaints of spasticity in his lower extremity, she had recommended that he undergo manual muscle testing, and she had requested that plaintiff obtain an MRI of his thoracic and lumbar spines to rule out a syrinx[7]. (Tr. 278). Plaintiff was referred to a family financial advocate to work on health care financial issues. (Tr. 279). He was to follow up with Nurse Thoman in the Spina Bifida Clinic in six months. (*Id.*). Plaintiff was also referred to the Bureau of Vocational Rehabilitation (BVR). (Tr. 284).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

---

[7] A "syrinx" is a "pathological tube-shaped cavity in the brain or spinal cord." http://medical-dictionary.thefreedictionary.com/syrinx.

14

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 1, 2008, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairment: lumbar level spina bifida

15

with leg length discrepancy (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity (RFC) to perform the requirements of work activity except as follows: He can lift/carry up to 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for up to four hours in an eight-hour workday; he can stand/walk for 45 minutes at one time and then must be allowed to sit for five minutes. He can sit for a total of about six hours in an eight-hour workday; he can sit for 45 minutes at one time and then must be allowed to stand for two to three minutes. He can only occasionally stoop, kneel, crouch and climb ramps/stairs. He cannot walk on grossly uneven terrain. He should not perform crawling, balancing, climbing of ropes, ladders, or scaffolds, or work at unprotected heights.

6. The claimant has no past relevant work (20 CFR 416.965).

7. The claimant was born [in 1990] and was 18 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

8. The claimant has a high school education by GED and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).[8]

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 1, 2008, the date the application was filed (20 CFR 416.920(g)).

---

[8]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled occupations such as clerical support, of which there are approximately 144,000 jobs in the national economy and 800 jobs in the regional economy; protective service/surveillance system monitor, of which there are approximately 25,000 jobs in the national economy and 150 jobs in the regional economy; and production assembler, of which there are approximately 60,000 jobs in the national economy and 70 jobs in the regional economy. (Tr. 17).

(Tr. 12-17).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to properly analyze plaintiff's impairment under the Listing of Impairments; (2) the ALJ erred by determining that plaintiff's

neurogenic bladder is not a "severe" impairment; (3) the ALJ erred by assigning improper weight to the opinions of the medical sources of record; and (4) the ALJ erred by discounting plaintiff's credibility.  Plaintiff further claims that the May 2010 records from plaintiff's visit to the Spina Bifida Clinic constitute new and material evidence which require remand of this case to the ALJ pursuant to Sentence Six of 42 U.S.C. § 405(g).

### 1. The Criteria for a Sentence Six Remand Are Not Satisfied.

The District's Court review is limited to evidence that was before the Commissioner. *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992).  When the Appeals Council declines review, as it did in this case, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review.  *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).  The Court may not consider evidence presented for the first time to either the Appeals Council or the District Court in deciding whether to uphold, modify, or reverse the ALJ's decision.  *Id.* at 696.  *See also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996).

Accordingly, the Court may not consider the following evidence presented to the Appeals Council in this case in deciding whether to uphold, modify, or reverse the ALJ's decision: (1) the May 6, 2010 thoracic and lumbar spine MRI results (Tr. 312), and (2) the treatment records from Children's Hospital dated May 10, 2010.  (Tr. 313-319).

"The district court can, however, remand the case [pursuant to Sentence Six of 42 U.S.C. § 405(g)] for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it" to the ALJ. *Cline*, 96 F.3d at 148.  *See also Ferguson v. Commissioner of Social Sec.*, 628 F.3d 269, 276 (6th

Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. *Foster*, 279 F.3d at 357. To show the evidence is "material" within the meaning of § 405(g), the claimant must establish there is a reasonable probability that the Commissioner would have reached a different decision if the evidence had been presented in the administrative proceeding. *Sizemore v. Secretary of H.H.S.*, 865 F.2d 709, 711 (6th Cir. 1988). To show "good cause," the moving party must present a valid justification for his failure to have acquired and presented the evidence in the prior administrative proceeding. *Foster*, 279 F.3d at 357. The burden of showing a remand is appropriate is on the claimant. *Id.*

Plaintiff has not made the required showing with respect to the evidence he seeks to present in this case. First, the MRI report and hospital records generated in May 2010 are not "new" as they pre-date the ALJ's June 2010 decision.

Second, plaintiff has not shown that the records are "material" in that they raise a "reasonable probability" that the ALJ would have reached a different disposition of the disability claim if presented with the new evidence. *See Ferguson*, 628 F.3d at 276. The records do not disclose a change in plaintiff's symptoms but instead report that plaintiff denied bowel/bladder problems, he denied changes in gait, and he stated that his back pain was unchanged from the previous visit. (Tr. 313). Nor has plaintiff shown there is a reasonable probability the Commissioner would have reached a different conclusion based on the objective findings set forth in the records. Although the MRI disclosed a "para-esophageal fluid collection" for which a CT of the chest was ordered to obtain further clarification, the records do not discuss the

19

significance of this finding.[9] (Tr. 317). Plaintiff alleges that the records include a new diagnosis of a "syrinx," which he asserts provides an explanation for his symptoms and bolsters his credibility, but in fact the new medical records make no mention of a syrinx. Finally, while the new records reference a "possible retethering," they do not elaborate on this possible finding. (Tr. 317). Accordingly, there is not a reasonable probability the Commissioner would have reached a different decision if presented with the May 2010 evidence.

Finally, plaintiff not shown good cause for failing to submit the evidence prior to the ALJ's decision. Plaintiff states that he does not know whether his prior counsel requested the records in a timely fashion but surmises that even had counsel done so, it is unlikely Children's Hospital would have responded promptly enough for plaintiff to submit the evidence prior to issuance of the ALJ's decision.[10] (Doc. 8 at 21). Plaintiff also states, however, that after he asked present counsel to represent him on July 27, 2010, and counsel requested him to immediately obtain records from Children's Hospital, the hospital responded by faxing the records on August 3, 2010 (*Id.* at 21-22, citing Tr. 313-319), which was within one week of counsel's request. The hospital's prompt response indicates that had plaintiff requested the records from the hospital in a timely manner, plaintiff could have submitted the May 6, 2010 MRI results and May 10, 2010 treatment notes prior to issuance of the ALJ's June 9, 2010 decision. Plaintiff has failed to show good cause for his failure to do so.

---

[9]The MRI results also refer to a "small syringomyelia from T2 to termination of conus" in parentheses, but it is not clear if this finding is different from the para-esophageal fluid. (Tr. 313). Assuming it is a separate finding, there is no indication in the new records that the syringomyelia imposed any new functional limitations or is of sufficient severity to satisfy the Listing 11.19 for "syringomyelia" (a fluid buildup in the upper spinal cord, causing numbness, headache, and limb pain). *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002373.

[10]Different counsel represented plaintiff at the ALJ hearing and before the Appeals Council.

Accordingly, a remand pursuant to Sentence Six of 42 U.S.C. § 405(g) for further administrative proceedings in light of the evidence presented to the Appeals Council and to this Court is not warranted. Plaintiff's request for a Sentence Six remand should be denied.

## 2. The ALJ did not improperly analyze plaintiff's impairment under the Listings.

Plaintiff contends that the ALJ erroneously evaluated his spinal cord impairment under Listing 11.04B ("disorganization of motor function") and failed to properly evaluate his impairment under three potentially applicable Listings: Listings 1.04A (Disorders of the spine), 11.08 (Spinal cord or nerve root lesions, due to any cause) and 11.19 (Syringomyelia). Plaintiff argues there is evidence throughout the record that shows he appears to meet Listing 1.04A. Plaintiff asserts that even if he did not meet Listing 11.04A at the time he filed for benefits, he has met that Listing as well as Listings 11.08 and 11.19 since at least 2009, or at the latest at the time of the hearing. Plaintiff argues that the new evidence he has submitted, which purportedly shows he has a recurrent tethered cord and a syrinx, demonstrates that he now meets Listing 11.19. Plaintiff contends that because the ALJ failed to specifically discuss the applicability of the relevant Listings, this Court cannot determine whether the ALJ's decision is supported by substantial evidence, and remand for consideration of whether he meets the Listings is therefore required. (Doc. 12 at 2-3).

Listing 1.00 encompasses "Musculoskeletal System" disorders. The introduction to Listing 1.00 provides that in general, under that section, "loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence. . . . "

Listing 1.00B(1). Listing 1.00B(1) also states: "Impairments with neurological causes are to be evaluated under 11.00ff." Listing 1.00K provides that neurological abnormalities resulting from disorders of the spine listed in 1.04 "result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord," which impingement on nerve tissue may result from a number of conditions. Listing 1.00K(4) states that neurological abnormalities resulting from these disorders "are to be evaluated by referral to the neurological listings in 11.00ff, as appropriate." Listing 1.00K(4) lists a number of miscellaneous conditions that may cause "weakness of the lower extremities, sensory changes, areflexia, trophic ulceration, bladder or bowel incontinence, and that should be evaluated under 1.04," including "osteoarthritis, degenerative disc disease, facet arthritis, and vertebral fracture." Listing 1.00K(4) states that disorders such as spina bifida and tethered cord syndrome may also cause such abnormalities and provides: "In these cases, there may be gait difficulty and deformity of the lower extremities based on neurological abnormalities, and the neurological effects are to be evaluated under the criteria in 11.00ff."

Listing 11.00 encompasses "Neurological" disorders. In order to meet Listing 11.08, a claimant must have "[s]pinal cord or nerve root lesions, due to any cause with disorganization of motor function as described in 11.04B." In order to meet Listing 11.19, a claimant must have "Syringomyelia" with either "A. Significant bulbar signs[11]; or B. Disorganization of motor function as described in 11.04B." Listing 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross

---

[11]"Bulbar signs" are problems with the functions of the bulbar muscles, which are the muscles supplied by the motor nerves coming off the brain stem. The bulbar muscles control breathing, swallowing, talking and other functions of the throat. http://www.kennedysdisease.org/about-kennedys-disease/symptoms.

and dexterous movements, or gait and station (see 11.00C)." Paragraph 11.00C provides:

> *Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

Here, the ALJ determined that plaintiff's impairment is not attended by findings of sufficient severity to meet or equal the requirements of the Listing, specifically § 11.00ff, and that there was no "disorganization of motor function" as described in § 11.04B. (Tr. 14). The ALJ correctly determined that plaintiff's spinal impairment was to be analyzed under 11.00ff. *See* Listing 1.00B ("Impairments with neurological causes are to be evaluated under 11.00ff"); Listing 1.00K(4) (where disorders such as spina bifida cause abnormalities such as weakness of the lower extremities and sensory changes, there may be "gait difficulty and deformity of the lower extremities based on neurological abnormalities, and the neurological effects are to be evaluated under the criteria in 11.00ff.").

Furthermore, the ALJ's finding that plaintiff does not satisfy the "disorganization of motor function" requirement of § 11.04B is supported by substantial evidence. While the evidence shows that plaintiff has "[s]ignificant and persistent disorganization of motor function" of the left lower extremity, plaintiff has not pointed to evidence to show there is significant and persistent disorganization of motor function of a second extremity as described in 11.04B. Plaintiff refers only to a sensory loss in both extremities to show he meets the Listing in this respect. However, this is insufficient to demonstrate plaintiff's impairment is of Listing level severity as the medical evidence shows that plaintiff's right calf is "quite strong" (Tr. 250); the

23

range of motion of his right ankle is normal (Tr. 230); and he does not wear a brace on the right

leg. (Tr. 250). In addition, the state agency reviewing physician imposed limitations as to foot

pedals for only plaintiff's left side based on the medical evidence of record. (Tr. 237).

Accordingly, because he has failed to show he satisfies §11.04B, plaintiff is precluded from

meeting either Listing 11.08 or Listing 11.19. Plaintiff has failed to demonstrate he satisfies

Listing 11.19 for Syringomyelia for the additional reason that he has pointed to no evidence

before the Court showing he suffers from this condition. To the contrary, the only evidence

plaintiff cites to show he meets Listing 11.19 for Syringomyelia was not before the ALJ and

cannot be considered by the District Court. (Doc. 8 at 12-13). Accordingly, the ALJ did not err

by failing to find plaintiff does not meet Listing 11.08 or 11.19.

Plaintiff also contends that the ALJ erred by failing to analyze his impairment under

Listing 1.04 because he appears to meet Listing 1.04A. Plaintiff contends there is evidence

throughout the record that shows he satisfied the criteria for "inability to ambulate effectively."

(Doc. 8 at 12). Plaintiff contends this evidence consists of deformity in his left ankle, atrophy of

his left calf, weakness/motor loss of his left leg, and sensory loss in both lower extremities. (*Id.*,

citing Tr. 195-224, 225-234, 244-303). In addition, plaintiff contends that doctors have

repeatedly noted that although he requires the use of an AFO brace to ambulate, he still has an

abnormal gait. (*Id.*). Plaintiff contends that the ALJ erred by relying on the fact that he does not

need a cane to ambulate in determining he does not meet Listing 1.04A. (*Id.* at 12). Plaintiff

also contends that the ALJ erred by relying on statements made by plaintiff's treating physicians

in 2005 and 2007 that plaintiff walked extensively around town and ignoring evidence that

plaintiff's ability to walk decreased over time until by 2009, he was having significant problems

walking due to episodes of leg stiffness.  (*Id.*, citing Tr. 258).  Finally, plaintiff asserts that by

finding he cannot work on "grossly uneven terrain," the ALJ effectively determined that  plaintiff

met Listing 1.04A because the Listing includes as an example of  "ineffective ambulation" the

"inability to walk a block at a reasonable pace on rough or uneven surfaces."  *See* Doc. 12 at 2,

n.1.

       Listing 1.04A, encompasses "Disorders of the spine (e.g., herniated nucleus pulposus,

spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis,

vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the

spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine).

       Functional loss for purposes of a musculoskeletal impairment is defined in pertinent part

as the inability to ambulate effectively on a sustained basis for any reason, including pain.

Section 1.00(B)(2)(b) of the Listings defines the "inability to ambulate effectively" as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the
> ability to walk; i.e., an impairment(s) that interferes very seriously with the
> individual's ability to independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having insufficient lower extremity
> functioning (see 1.00J) to permit independent ambulation without the use of a
> hand-held assistive device(s) that limits the functioning of both upper extremities.
> (Listing 1.05C is an exception to this general definition because the individual has
> the use of only one upper extremity due to amputation of a hand.)

That section also explains the meaning of "to ambulate effectively" as follows:

> (2) To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out activities

of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

As explained above, the ALJ was correct in applying Listing 11.00 for Neurological disorders. However, assuming plaintiff's spina bifida were properly analyzed under Listing 1.04A, plaintiff has not shown that the ALJ erred by failing to find his impairment meets or equals this Listing. Specifically, plaintiff has failed to demonstrate that he satisfied the criteria for "inability to ambulate effectively" as he has not shown that he had an "extreme limitation of the ability to walk." Listing 1.00B(2)(b)(1). The Children's Hospital report from June 2008 noted that plaintiff "is a community ambulator who walks long distances frequently" and who does not use any assistive devices for ambulation. (Tr. 244). The evidence does not show that plaintiff's condition subsequently worsened to a point where he met the Listing. Although plaintiff complained to his doctor of episodes of left leg stiffness in October 12, 2009, that significantly interfered with his ability to walk if the episodes occurred while walking (Tr. 258), the ALJ could conclude from other doctors' reports from that same date that plaintiff's ability to walk had not significantly worsened. The reports state that plaintiff complained of "intermittent back pain that is localized to his right low back" but he "denie[d] any radiating pain or any changes in his strength or ability to ambulate . . . . From a functional standpoint Darrell continues to do relatively well. He is walking household and long community distances. He is

26

ascending and descending stairs independently as well." (Tr. 254). It was noted that if nothing of concern was found on imaging, then plaintiff's back pain was believed to be mechanical in nature, but plaintiff did not appear to be interested in physical therapy. (*Id.*). In addition, plaintiff testified at the March 2010 hearing that he could walk for about one hour before he started to get tired and his legs "start[ed] locking up." (Tr. 30). Finally, by finding plaintiff cannot work on "grossly uneven terrain," the ALJ did not effectively determine plaintiff met Listing 1.04A because the Listing does not include the inability to work on grossly uneven terrain as an example of "ineffective ambulation." Thus, the ALJ did not err by failing to find plaintiff's impairment meets Listing 1.04A.

The ALJ properly analyzed plaintiff's impairment under the criteria applicable to a neurological disorder and adequately explained his reasons for determining that plaintiff does not meet or equal the Listing. His finding that plaintiff does not satisfy the criteria of § 11.04B for "[s]ignificant and persistent disorganization of motor function" is supported by substantial evidence. For these reasons, plaintiff's first assignment of error should be overruled.

**2. The ALJ did not err by finding plaintiff's neurogenic bladder is not a "severe" impairment.**

Plaintiff alleges as his second assignment of error that the ALJ erred by finding his neurogenic bladder is not a severe impairment because plaintiff could spontaneously void, he could wear normal underwear, and he did not have a history of urinary tract infections. (Doc. 8 at 13, citing Tr. 13). Plaintiff alleges that his neurogenic bladder is a "severe" impairment because he required catherization until 2005, and although his neurogenic bladder and bowel improved "somewhat" in his teenage years, he continued to have trouble emptying his bladder

27

completely. (Doc. 8 at 3, citing Tr. 211, 252). Plaintiff contends that the ALJ failed to determine how long it takes him to void, which would affect how much time plaintiff would require for breaks; whether plaintiff might still have the occasional accident, which would necessitate trips home or breaks at work to change his clothing; and whether he has pain in his bladder due to fullness, bladder spasms, or the inability to completely empty his bladder, which would affect plaintiff's time away from his workstation and his ability to perform the tasks assigned to him. (*Id.* at 13-14). Plaintiff contends that the ALJ failed to account for such limitations in the RFC finding and remand is appropriate for formulation of an RFC that includes the need for unscheduled or lengthy breaks, the occasional trip home or to the bathroom to change clothes, and the difficulty with concentration due to pain and the urge to urinate. (*Id.* at 14).

In response, the Commissioner contends there is no evidence in the record to support plaintiff's assertions that it may take him longer to use the bathroom or that he may have an occasional accident, and plaintiff did not testify to any problems related to his bladder, bowel, or need to use the bathroom. (Doc. 11 at 11).

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. *See* 20 C.F.R. § 416.921(b)(1). Basic work activities relate to the abilities necessary to perform most jobs, such as the ability to perform physical functions. 20 C.F.R. § 416.921(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act.

28

*Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimis* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers v. Commissioner*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

Here, the ALJ determined that plaintiff has the severe impairment of lumbar level spina bifida with leg length discrepancy. (Tr. 12). The ALJ also found that plaintiff has a neurogenic bowel and bladder, but that it was reported on February 4, 2008, that plaintiff had the ability to spontaneously void; he was having no problems with bladder incontinence; he provided no history of urinary tract infections or stones; there were no reported problems with neurogenic bowel; stooling was spontaneous without accidents; and he was able to wear regular underwear without difficulty. (Tr. 13, citing Tr. 196-97). The ALJ further noted the August 4, 2008 kidney and bladder sonography results, which showed findings consistent with a neurogenic bladder, a nonspecific finding of debris within the urinary bladder, and normal kidneys. (*Id.* at Tr. 252-253). The ALJ concluded in light of these findings that plaintiff's neurogenic bowel and bladder do not significantly limit his ability to perform basic work activities. (Tr. 13). Substantial evidence supports the ALJ's determination. Plaintiff has not provided any citations to the record in support of his position that his neurogenic bladder imposes the functional limitations he describes in the Statement of Errors. To the contrary, the May 21, 2007 urologist's report cited

29

by plaintiff mentions that plaintiff stated "sometimes he has to stand at the toilet a minute before the urine will come," but it states that plaintiff does not appear to be symptomatic despite being unable to "empty completely" and notes no other issues with his bladder or bowels.  (Tr. 211). The report states that plaintiff "is completely continent day and night;" he is "bowel continent;" "[h]e has had no urinary tract infections;" although he sometimes has to stand at the toilet a minute "before the urine will come," he denies having to strain; he is not on any bowel or bladder medications; and he goes when he feels the need to urinate.  (*Id*.).  Nor is there any medical or other objective evidence of record that shows plaintiff's neurogenic bladder limits him to any extent.  As there is no evidence of record that shows plaintiff is functionally limited to any degree by his neurogenic bowel or bladder, the ALJ did not err by determining plaintiff's neurogenic bladder does not significantly limit his ability to perform basic work activities and therefore is not a "severe" impairment.  Plaintiff's second assignment of error should be overruled.

### 3. The ALJ's assessment of the medical opinions of record is supported by substantial evidence.

Plaintiff alleges as his third assignment of error that the ALJ improperly weighed the medical opinions and unreasonably discounted the opinion of certified nurse practitioner Thoman in violation of Social Security Ruling 06-3p.  (Doc. 8 at 14-16).  Plaintiff alleges that Nurse Thoman has been closely involved in his care at the Spina Bifida clinic and treated him on at least three occasions[12]; her opinion that plaintiff is significantly limited in his ability to sit, stand,

---

[12]Plaintiff alleges in his reply brief that the progress notes at Tr. 275-283 are from an office visit on October 30, 2009.  (Doc. 12 at 4).  This is not correct.  The progress notes at Tr. 275-283 show that Nurse Thoman filed the notes on October 30, 2009, but that the date of service was October 12, 2009.  Thus, the record includes notes from two dates, not three dates, on which Nurse Thoman saw plaintiff: (1) June 2, 2008, which was before she completed the RFC assessment (Tr. 244-246), and (2) October 12, 2009, which was after she had completed the assessment. (Tr. 275-303).

lift and carry is largely consistent with the opinion of consultative examining physician Dr.

Swedberg, who opined that plaintiff can do "no more than a mild amount" of those activities; and

Nurse Thoman took into account the fact that plaintiff has "good" days and "bad" days whereas

Dr. Swedberg did not, which provides a reasonable basis for the differences in their opinions.

(*Id.* at 16; Doc. 12 at 4-5).

The Commissioner asserts that the ALJ reasonably discounted Nurse Thoman's opinion

concerning the functional limitations imposed by plaintiff's impairment as inconsistent with the

medical evidence and the record as a whole.  (Doc. 11 at 13).  The Commissioner contends that

the ALJ reasonably relied upon the opinions of the state agency reviewing physicians, Drs.

McCloud and Cruz (*Id.* at 14, citing 20 C.F.R. § 416.927(f)(2)(i)),[13] and properly gave significant

weight to the assessment of the consultative examining physician, Dr. Swedberg (*Id.* at 15, citing

*Blakley*, 581 F.3d at 409; Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (July 2, 1996)), whose

opinions were consistent with the record as a whole.

Under the Social Security regulations, evidence from an "acceptable medical source" is

required to establish the existence of a medically determinable impairment.  20 C.F.R. §

416.913(a); SSR 06-03p, 2006 WL 2329939, at *2.  However, evidence from "other sources" as

defined under the regulations may be used to show the severity of the claimant's impairment and

how it affects the individual's ability to function.  20 C.F.R. § 416.913(d).  A nurse practitioner

is one such "other source."  *Id.*  It may be appropriate to give more weight to the opinion of a

medical source who is not an "acceptable medical source" if she has seen the individual more

often than the treating source and has provided better supporting evidence and a better

---

[13]20 C.F.R. § 416.927(f)(2) was redesignated as 20 C.F.R. § 416.927(e)(2) effective March 26, 2012.

explanation for her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *5. The ALJ has the

discretion to determine the appropriate weight to accord the weight of a medical source who is

not an "acceptable medical source" based on all the evidence in the record. *Walters v.*

*Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).

Because Nurse Thoman is not an "acceptable medical source," it was within the ALJ's

discretion to determine what weight to accord her opinions based on all the evidence in the

record. *Id.* The ALJ was not bound by Nurse Thoman's opinion that plaintiff has "a lifelong

disability." *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (ultimate

decision of whether claimant is disabled is reserved to the Commissioner) (citing *Harris v.*

*Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). In addition, the ALJ was entitled to reject Nurse

Thoman's opinion that plaintiff is able to stand/walk less than two hours in an eight-hour

workday, sit about four hours in an eight-hour workday, and walk zero blocks without rest or

severe pain, and that he is limited to less than an eight-hour workday. (Tr. 15-16, citing Tr. 304-

08). The ALJ reasonably determined that Nurse Thoman's opinion was inconsistent with

plaintiff's own report during a Children's Hospital clinic visit on June 2, 2008, that he has no

discomfort and wears his AFO when he walks around the city, and with statements in the report

that he "apparently walks quite a bit" and could "keep walking for hours." (Tr. 16, citing Tr.

249). Although plaintiff contends that the ALJ could not reasonably rely on reports that predate

Nurse Thoman's report because plaintiff's condition worsened after June 2008, neither the

medical evidence of record nor plaintiff's subjective complaints demonstrate a worsening of

plaintiff's condition. To the contrary, Dr. McMahon at the Spina Bifida Clinic reported in

October 2009 that plaintiff continued to do "relatively well" from a functional standpoint;" he

32

was "walking household and long community distances;" and he was ascending and descending stairs independently. (Tr. 254). Moreover, plaintiff testified at the ALJ hearing that he could walk for approximately an hour before he started having problems with his legs. (Tr. 30). Accordingly, the ALJ did not err by rejecting Nurse Thoman's opinions and giving greater weight to the opinions of the state agency reviewing physicians and the consultative examining physician. *See* 20 C.F.R. 416.927(e)(2) (ALJ must consider findings and other opinions of state agency medical consultants and other program physicians, except for the ultimate determination as to whether the claimant is disabled). Plaintiff's third assignment of error should be overruled.

### 4. The ALJ's credibility assessment is supported by substantial evidence.

Plaintiff alleges as his fourth assignment of error that the ALJ erred by finding he is not credible. (Doc. 8 at 16-19). Plaintiff contends that the ALJ improperly used boilerplate language and circular logic to discount his credibility. Plaintiff also alleges that the specific examples the ALJ provided to support the credibility finding do not apply to the entire time period at issue and do not take into account plaintiff's progressively worsening condition. Plaintiff further contends that the ALJ erred by faulting plaintiff for not following through with imaging studies or physical therapy when the record clearly shows that plaintiff was unable to follow treatment recommendations due to financial constraints. (*Id.* at 18, citing Tr. 258, 260, 265, 276). Plaintiff also asserts that the ALJ erred by relying on a Bureau of Vocational Rehabilitation (BVR) report stating that he should consider a light or sedentary job (*Id.*, citing Tr. 15) and by failing to discuss the state agency reviewing physician's opinion that plaintiff's allegations were credible. (Tr. 15, citing Tr. 242).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the

33

ALJ's credibility finding is entitled to deference and should not be discarded lightly.

*Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538

(6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his

reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's

articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is

absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519

(6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p, 1996 WL 374186, at *2 (July 2, 1996), describes the

requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the
> individual's allegations have been considered' or that 'the allegations are (or are
> not) credible.' It is also not enough for the adjudicator simply to recite the factors
> that are described in the regulations for evaluating symptoms. The determination
> or decision must contain specific reasons for the finding on credibility, supported
> by the evidence in the case record, and must be sufficiently specific to make clear
> to the individual and to any subsequent reviewers the weight the adjudicator gave
> to the individual's statements and the reasons for that weight.

Here, the Court must defer to the ALJ's decision to discount plaintiff's credibility. The

ALJ did not use boilerplate language when rejecting plaintiff's disability. To the contrary, as

plaintiff acknowledges in the Statement of Errors (Doc. 8 at 12), the ALJ cited specific reasons

for finding plaintiff was not fully credible. The ALJ determined that the clinical findings and test

results were not consistent with plaintiff's allegations of disabling symptoms. (Tr. 15). The ALJ

noted that although plaintiff cited back pain as the reason he cannot work a full day, the July 2,

2008 Children's Hospital notes state that he was apparently walking quite a bit and could keep

walking for hours  (Tr. 15, citing Tr. 249); clinic notes dated October 12, 2009, reported that

34

from a functional standpoint, plaintiff continued to do "relatively well" and he denied any radiating pain or any changes in his strength or ability to ambulate (*Id.*, citing Tr. 254); and the medical record did not otherwise show that plaintiff was experiencing disabling back pain.  (*Id.*). In addition, the ALJ reasonably relied on the fact that plaintiff was not taking any medication for his back pain.  (Tr. 15).  The ALJ further noted that plaintiff did not follow through with recommendations in October 2009 that he obtain imaging studies or participate in physical therapy.  (*Id.*).  Although plaintiff cites financial constraints as the reason for his failure to obtain these recommended services, he has not pointed to any evidence in the record to show he sought financial assistance or otherwise pursued any efforts to obtain the recommended services after Children's Hospital referred him to a family financial advocate in October 2009.  (*See* Tr. 279).

The factors cited by the ALJ were valid considerations to take into account in assessing plaintiff's credibility.  The ALJ's credibility determination is supported by substantial evidence, and the Court has no basis for disturbing the credibility finding.  Plaintiff's fourth assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: __8/9/2012__                       *Karen L. Litkovitz*
                                         Karen L. Litkovitz
                                         United States Magistrate Judge

35

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DARRELL HIBBARD,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-599
Dlott, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

36